STATE of Missouri, Plaintiff-Respondent,

v.

Lloyd KLOSTERMAN, Defendant-Appellant.

No. 55524.

Supreme Court of Missouri, Division No. 1.

Oct. 11, 1971.

[1]. State v. Haygood, Mo., 411 S.W.2d 230; State v. Malone, Mo., 301 S.W.2d 750; State v. Vincent, Mo., 321 S.W.2d 439.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Oliver & Gregory, Max Oliver, Montgomery City, Edw. Hodge, Mexico, Mo., for defendant-appellant.

SEILER, Judge.

Defendant was prosecuted under Sec. 561.450, RSMo 1969, V.A.M.S. for giving a $25.10 "no funds" check, dated September 30, 1967, to a filling station operator, convicted, and sentenced to two years' imprisonment. Defendant operated a grocery store in Steedman, in Callaway County, and the "no funds" check was on the Steedman Bank. The evidence was that defendant at one time had a checking account in the Steedman Bank, but it was closed out July 10, 1967 and there were no funds in it after that date. He also had an account in Fulton National Bank, in Fulton. Over the objection of the defendant, the state introduced into evidence nine other checks, written between September 20 and 29, 1967, to the same filling station operator, in amounts varying from $20.00 to $25.25, drawn on the Fulton National Bank, which were returned because of "uncollected funds". These checks were offered and admitted on the theory they were similar offenses evidencing defendant's intent to defraud. The prosecutor told the trial court that to exclude the Fulton checks would "gut" his case. He referred to the Fulton checks repeatedly throughout the trial and in his argument to the jury.

It also appeared in evidence that there was another account in the Steedman Bank, to-wit: "Lloyd Klosterman, Gdn. Alfred Klosterman". Alfred Klosterman was defendant's father and had been declared incompetent. A check on the guardianship account, to the same filling station operator, also dated September 30, 1967, in the amount of $26.00, was paid by the Steedman Bank, leaving a balance in the guardianship account of $83.39. One of the defendant's contentions was that he and his wife had money of their own in the guardianship account, known to the

bank, and that therefore he did have funds in the Steedman Bank at the appropriate time; also that he had intended to sign the $25.10 check as guardian, but had by mistake signed his individual name.

■ We reverse and remand, because the state did not carry its burden of showing the checks on the Fulton National Bank were similar offenses or that criminal agency attached to them. The reason the Fulton bank returned the checks, as best we can determine from the confusing and contradictory testimony of the only witness on the point, an officer of the Fulton Bank, is that the bank wanted to be sure that the deposits made by the defendant (or perhaps it was only as to some of the items in the frequent deposits made by defendant) cleared before the bank honored checks written by defendant which were presented in the interim. The record is bare of evidence as to what made up the deposits made by defendant in the Fulton Bank—whether they consisted of checks received by defendant in his grocery store from individuals drawn on other banks, and, if so, on what banks and in what towns or cities, or whether they were checks drawn by defendant on himself in other banks, or what. There was no evidence to substantiate even an inference that there was any attempt by defendant to "kite" funds from the Fulton bank to the Steedman bank, or vice versa, nor is there any evidence that defendant made deposits of various checks in his account at the Fulton bank knowing they would not be collected or with any intent to build up a false balance in the Fulton bank.

Nor does the record show what happened to the deposits made by defendant, as to whether they turned out to be collectible or not. The bank officer said he could not tell from the record. In fact, the record is not clear as to whether the deposits made by defendant were even credited to his account in the Fulton bank at the time of deposit or not. At one time in the trial, opposing counsel seemed to be in agreement that the deposits shown on defendant's bank statements from the Fulton bank did not include uncollected funds or deposits and this is the position the state takes in its brief. The bank officer seemed to say, however, the bank would give the depositor credit for such deposits before they cleared. At other times he seemed to say the opposite. At one point, in answer to the court's question about when the depositor knows about the money being available to him if he deposits uncollected checks in the bank and is given a deposit slip showing the deposit, the banker answered, "He doesn't know." Judging from some of the penciled notations on the Fulton bank ledger sheets, it appears the bank would make its own judgment about which deposits or parts thereof it considered to be in the category of uncollected funds, without informing the depositor.

As stated, the nine Fulton checks were written from September 20 to September 29, 1967. The Fulton bank ledger on defendant's account showed the following deposits and closing balances on these banking days:

| DATE | DEPOSITS | CLOSING BALANCE |
|------|----------|-----------------|
| September 20 | $126.19 | $ 18.12 |
| September 21 | 349.09 | 49.36 |
| September 22 | 306.65 | 356.01 |
| September 25 | 811.95 | 1032.30 |
| September 26 | 336.00 | 731.98 |
| September 27 | 331.26 | 1024.90 |
| September 28 | 392.65 | 678.33 |
| October 2 | 155.79 | 487.92 |
| October 3 | None | 71.92 |

Defendant's balance on any of these days, except September 20, was sufficient to pay any of the checks in question.[1] It

1. This is even clearer if the fact is, as the state declares in its brief, that the Fulton bank did not credit the amount of deposits to the defendant's account, pending notice that the deposit would be paid. If so, then the deposits actually credited and closing balances shown in the above tabulation were all solid. In addition, if the state is correct, there would also be deposits, in undisclosed amounts, not yet credited to defendant's account, on which the bank was awaiting word as to clear-

is significant that none of the returned checks was turned down by the bank because of "insufficient funds". The banker confirmed that each check was "uncollected funds", not "insufficient funds". Two of the checks, totalling $45.25, were returned by the Fulton Bank on September 25, one for $20.00 on September 27, seven totalling $154.98, on October 2, and one on October 3 for $23.55, all because of "uncollected funds". The banker's explanation was that the bank does not pay out on a given day any more than they are sure they have on hand: They send back all other checks presented and wait and see if the previous deposit clears. The deposit may prove to be all right or it may not.

The difficulty with using checks returned under these circumstances as constituting similar offenses to the giving of a "no funds" check, to show intent to defraud, is that there is nothing to show what happened to the deposits on which the bank was waiting or the quality of the deposits—whether they cleared, or whether there was anything suspicious about them or reason to question some particular item or items in a given deposit, or whether defendant had any reason to believe any of the checks making up his deposits in the Fulton bank were not good. Judging from deposit slips which the state put in evidence, defendant's deposits included numerous small checks, as would be expected from the operator of a small grocery store. For example, one deposit slip was for $23.02 and consisted entirely of small checks. Another was for $609.20 and consisted of $479.00 in currency and eight checks. He may have accepted checks from his customers believing them to be perfectly good checks. The evidence does not show. The fact that the Fulton bank, in its depositor agreement, which was also in evidence, stated that "All items are credited subject to final payment" and, in its caution, did not pay out more than it

had on hand in the account at the moment, returning all other checks with the notation "uncollected funds", does not automatically convert such checks into instruments to defraud on the part of the depositor. That kind of check return is much different from the return of a check for the reason the customer has no funds in the bank, which is the basis of the prosecution against defendant on the Steedman bank check.

Many a person acting in entire good faith writes a check against a deposit before the deposit clears. Without a showing why the deposit failed to clear, and, further, what the depositor should have known as to the likelihood that it would not clear, the action of the bank, in refusing to honor such a check and returning it marked "uncollected funds" would be no proof of intent to defraud on the part of the depositor, much less proof of intent to defraud with respect to a check drawn on an entirely different bank, the Steedman Bank.

As illustrative of the unwarranted inference of intent to defraud flowing from the Fulton bank's "uncollected funds" checks, take the situation on October 3, 1967: On October 3, although there had been no deposit made that day, so that the balance as shown by defendant's statement was the same as it was at the close of October 2, the Fulton bank paid a check against defendant of $416.00. Yet, on October 2 the bank had refused to pay a number of defendant's checks, including seven of those issued to the filling station operator and received as exhibits against defendant. All that had happened was that with the arrival of October 3 another banking day had passed and so the Fulton Bank felt safe in paying on October 3 against defendant's earlier deposits, perhaps those of September 28 or 29 (there is some indication in the record that the Fulton bank waited

ance, which, when received, would further swell defendant's account. This seems to be an unusual way to keep bank records,

but if that is what happened, it is even plainer there was nothing criminal about the Fulton checks.

"possibly four days" before it would honor checks against a deposit).[2]

It is true the three ledger sheets of the Fulton National Bank received in evidence covering the period September 8 to November 9, 1967, show a good many instances of checks drawn on defendant's account which were marked "RT", which means "Returned", but there was no explanation why, except as to the eleven checks marked as exhibits, nine of which were admitted in evidence, and these, as previously stated, were returned marked "uncollected funds". We fail to see how these ledger sheets, with no attempt to establish a beginning and ending balance, and no explanation of many abbreviations and pencilled notations appearing thereon, help the prosecution in its contention that the Fulton checks are evidence of similar offenses or of defendant's intent to defraud with respect to the Steedman check.[3]

The state relies on the rule that evidence of similar offenses, not too remote in time, is admissible in check cases to show intent to cheat and defraud, citing State v. De-Clue (Mo.Sup.) 400 S.W.2d 50 and State v. McWilliams (Mo.Sup.) 331 S.W.2d 610, to which can be added State v. Kaufman (Mo.App.) 308 S.W.2d 333. However, none of these cases involves the situation we have here.

In Kaufman, the $2,000 check under prosecution was turned down because of insufficient funds. Defendant wrote two checks on the same date on the same bank, totalling $3,090.00, when his balance was only $360.46. There was no uncollected funds aspect involved, nor was there even an objection to admission in evidence of the second check. Defendant was arguing no intent to defraud, because on previous occasions he had been permitted overdrafts, and the matter of considering the other check came about in the court's rejecting his contention by pointing out that defendant had issued two checks simultaneously against the same account, in a total amount far in excess of anything he could expect in the way of overdraft credit. In McWilliams, there were five checks, apparently all on the same bank, given to a filling station operator over a nine day period. Defendant was prosecuted on a "no funds" charge on one of the checks. The prosecutor proved and made frequent references to the other four checks. One of the state's witnesses referred to them as "bogus checks". The court held proof of the other checks was admissible on the issue of intent to defraud. The case, however, does not involve the question of admissibility of other checks drawn on a different bank where the maker did have funds, but which were dishonored because

---

2. The banker said that in turning the checks down on October 2 the bank did not take into consideration deposits made by defendant which were in the course of collection and that if the bank had given such credit it would have affected the checks to be returned. The court sustained the state's objection to the question whether if the checks which were in process of collection had been paid there would have been sufficient funds to pay the returned checks. The court also refused defendant's offer of proof that by reason of his deposits he thought he had sufficient funds in the bank to pay the checks written by him and that any shortage came from the unilateral action of the bank in failing to credit the deposits. Finally, however, the banker testified that defendant's balance was sufficient to have paid all eleven of the Fulton checks marked as exhibits had the uncollected funds checks been in.

3. As further illustrative of the jumble surrounding the status of the Fulton account, we note that while the trial court excluded two of the returned Fulton checks, Exhibits 8 and 9, for the reason that the ledger sheets showed there were sufficient funds in the Fulton bank to pay these two checks (one of them reached the bank on October 2, on which day defendant's closing balance was $487.32 and the other reached the bank on September 25 when the closing balance was $1032.30), the court admitted six other checks, which also reached the bank on October 2 and admitted two others, which also reached the bank on September 25. Yet all these checks were in about the same denomination, varying between $20.00 and $25.25.

of uncollected funds. In DeClue, defendant was prosecuted on a $81.15 "no funds" check drawn on the Boone County National Bank. The state put into evidence six other checks drawn on the same bank about the same time, all returned unpaid and marked either "Acct. Closed" or "Not sufficient Funds" and one check drawn on another bank in Columbia, marked "Acct. Closed". This last check was admitted without objection. The court held that in view of the proof establishing that defendant had no funds in the Boone County Bank at the time any of the six checks on that bank were written, the checks were admissible to show at least an attempt on his part to commit similar offenses at about the same time as the offense under prosecution. There is no argument about the general rule, but the pattern of facts in DeClue is in no way similar to the facts in the case before us.

■ The state also proved by the filling station operator that as of trial date, none of the returned Fulton checks had been paid. This, in our opinion, does not bear on their admissibility. Admissibility depends upon whether, at the time of issuance or presentment, they then constituted sufficiently similar offenses to throw light on the question of intent to defraud with respect to the check which is the subject of the prosecution, State v. DeClue, supra. As pointed out, they did not. The reasons why the Fulton checks were not admissible did not change simply because they had not been paid by trial time. There could be many reasons why defendant, who was represented as an indigent by appointed counsel both at trial and on appeal, had not paid the Fulton checks by trial time even though he owed the money.

■ We have considered Sec. 561.470, RSMo1969, V.A.M.S., pertaining to the maker's failing for ten days after notice to pay the payee on a check on which payment has been refused by the drawee, this being declared prima facie evidence of intent to defraud and of knowledge of insuf-

ficient funds in the bank. This statute, in our opinion, has reference to the check under prosecution and is not meant to make all other unpaid checks admissible against the defendant to show intent to defraud or lack of sufficient funds with respect to the check which is the subject of the prosecution. The test of admissibility of other checks is still whether they satisfy the test of being a similar offense, sufficiently close in time, not merely the failure to pay for ten days.

■ Since the case is being remanded, we inform the parties we do not agree with defendant's contention that proof on his part that he had funds in the Steedman Bank in the guardianship account would be a defense. Defendant was contending that he and his wife deposited personal funds in the "Lloyd Klosterman, Gdn. Alfred Klosterman" account, so he thereby had funds in the Steedman Bank and does not fall within the proscription of Sec. 561.450, R.S.Mo 1969, V.A.M.S. against drawing a check " * * * on a bank in which the drawer of the check knows he has no funds * * *"; that the statute does not use the words "on an *account*" in which he knows he has no funds, but states only "a *bank*" in which he knows he has no funds. However, we believe it evident that the legislature intended to prohibit writing checks on a bank in which the drawer of the check knows he has no funds which can be reached by that check. Otherwise, if a person had a few dollars in a savings account in a bank he could draw checks on the bank and pass as many as he could, with no exposure to criminal liability, which was not the intention of the legislature.

Again, with reference to retrial, it would be proper, however, as the state concedes, for defendant to prove, if such is the case that he intended to sign the subject check in his guardian capacity, but mistakenly signed his individual name, as such a mistake would tend to render nonexistent the

necessary element of intent to cheat and defraud the payee.

Judgment reversed and cause remanded.

BARDGETT, J., concurs.

HOLMAN, P. J., concurs in result.